## PLYMPTON *v.* PRESTON et al.

Notice to a person, before his appointment as agent, will not be binding on the principal.

The Code, while it requires notice to a debtor of the transfer of a debt, has not prescribed any particular form in which it must be given. C. C. 2613. Nor will any misdescription, even as to the amount of the debt, vitiate the notice, where, from the rest of the description and the circumstances of the case, the error could not have misled the party notified.

The mere institution of an action, by the creditors of one who had made a *cessio bononum* under the stat. of 1817, and who had since acquired other property, to compel a new surrender, does not render the insolvent incapable, from the commencement of such action, of alienating his property in favor of a *bonâ fide* purchaser. Under that statue, such newly acquired property cannot be considered as thenceforth in the custody of the law. Until a judicial investigation has been had and a decree pronounced, the further liability of the insolvent is a matter *en pais*. Any other construction would defeat the policy of the statute.

Every one, not prohibited by law, may buy or sell.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. *Benjamin* and *Micou*, for the appellant. *Preston, Lockett* and *Goold*, for the defendants. The judgment of the court was pronounced by

SLIDELL, J. In 1844, *Preston* gave a mortgage in favor of *G. W. Boyd*, for $8000. This debt was reduced by payments to $5,500; and, in August, 1847, *Boyd* transferred the debt and mortgage to *Plympton. Preston* having refused to pay the accruing interest, *Plympton* brought suit against him in the district court of Jefferson. The defendant answered that, *Boyd* had made a *cessio bonorum*, in 1820; but, having subsequently come to better fortune, his creditors had instituted proceedings against him to compel a new surrender, had obtained an order appointing the sheriff syndic, and had cited *Boyd*, by service upon his agent *Florance*, in March, 1847; that, in 1848, the creditors had procured, in the district court of New Orleans, an order to sequester all *Boyd's* property, under which notice of seizure had been served upon *Preston*; that other creditors of *Boyd* had seized the debt in *Preston's* hands, under attachment; that

the transfer to *Plympton* was without legal consideration, and was simulated, and was made for the purpose of defeating *Boyd's* creditors.

*Plympton*, before being met by this defence, brought a second suit in the parish of Orleans, in which the syndic, the suing creditors, and *Preston*, were made parties. He alleged the validity of *Boyd's* transfer, and the invalidity of the pretensions of the defendant. He also obtained, upon giving bond, an injunction against the defendants, which he prayed might, after due proceedings, be made perpetual.

Our attention will be first directed to the character of the transfer made by *Boyd* to *Plympton* the reality and good faith of which have been attacked.

*Plympton* was a resident of Boston, where he owned real estate. He employed *Hawkes*, a real estate broker, to find a purchaser for his property; and *Hawkes*, having learned that *Boyd*, who was then in Boston, desired to purchase real estate there, brought him and *Plympton* together, and conducted a negotiation between them. This resulted in a written agreement, signed on the 3d July, 1847, by which *Plympton* agreed to convey his real estate to *Boyd* in exchange for two mortgage claims in Louisiana, one of them bearing eight and the other ten per cent interest. One of these claims was the *Preston* debt. It was a condition of the agreement, that *Plympton* should satisfy himself of the security of these claims; and, for that purpose, *Hawkes* addressed a letter of inquiry to *Florance*, a resident of this State, who had been *Boyd's* agent. On the 16th July, *Florance* replied, giving a detailed statement of the nature of the claims, and expressing his entire confidence in the safety of the investment. The agreement was then closed at Boston by *Plympton* and *Boyd*. The former made conveyances of the real estate, which were recorded, and possession was given. The latter forwarded instructions to *Florance* to make a notarial transfer of the mortgages claims to *Boyd* ; and a blank power was forwarded to him, signed by *Plympton*, constituting an agent to accept the transfer. This power was filled up with the name of a respectable member of the bar, who was employed to superintend the execution of the notarial transfer. The transfer is dated in August, 1847. A notice was served by the notary on the other debtor a day or two after the act of transfer was signed; and upon *Preston*, in the early part of October following.

After a careful scrutiny of the correspondence, the testimony of the broker and *Florance*, and the documentary evidence connected with this transfer, we have not found any thing which could authorize the belief that it was simulated, or which could cast a suspicion upon the good faith of *Plympton*. He must be, therefore, regarded as a purchaser in good faith, and for a valuable consideration.

It was argued that *Florance's* knowledge of the institution of a suit to compel a new surrender, which knowledge he derived from the service of citation upon him as the attorney of *Boyd*, must be deemed, by legal constrtruction, the knowledge of *Plympton*, who, upon closing his bargain with *Boyd*, constituted *Florance* his agent to take charge of the mortgage claims for him when transferred, and to superintend the preparation and execution at New Orleans of the notarial transfers. The legal effect of the institution of suit by *Boyd's* creditors will be hereafter considered; but whatever its effects, so far as the good faith of *Plympton* and the question of notice are involved, we are of opinion that the knowledge of *Florence* does not effect *Plympton* with constructive notice. The notice did not come to *Florance* while he was concerned for *Plympton*, but before his agency for *Plympton* began. See Story on Agency, p. 140. Story's Equity, p. 408. Livermore, on Agency, vol. 2, p. 237. Russell on Factors, 95.

PLYMPTON
*v.*
PRESTON.

For the purpose of giving validity to this transfer, as against third persons, it was necessary that notice of the transfer should be given. This, we think has been sufficiently done. The notice delivered to *Preston* by the notary, on the 9th October, 1847, is in the following words:

New Orleans, 24th August, 1847.

SIR: I am requested to inform you that, by an act passed before me on the 13th August instant, *Mr. B. Florance*, acting as the agent of *Geo. W. Boyd*, sold and transferred unto *Ralph Plympton*, of Boston, Massachusetts, the balance of a mortgage executed by you in favor of said *Boyd*, before *E. Barnett*, notary, in this city, on the 28th June, 1844, for twenty-five hundred dollars.

Your ob't servant,

D. I. RICARDO, Not. Pub.

To I. T. PRESTON, Esq.

Giving the defendants the benefit of the strict grammatical construction of the letter, we will consider the words "twenty-five hundred dollars," as referring to the amount of the mortgage. Construed in this sense, there is a descrepancy between the notice and the mortgage, which was for $8000 originally, and was reduced, at the time of the transfer, to $5,500. Considered with reference to the contents of the letter as a whole, the mistake is not of such importance as to affect the validity of the notice. The Code requires that notice of the transfer should be given to the debtor (art. 2613), but has not prescribed any particular form. In *Thomas* v. *Callihan*, 5 Mart. N. S. 182, it was said that a notice of assignment of debt may be fairly assimilated to the notice which must be given to endorsers of promissory notes, although the same exactness and promptitude may not be required in the former case as in the latter. In *Gillett* v. *Landis*, 17 La. 472, the court said: "We are not aware that any particular form is required in giving notice of a transfer. The principal object of the law appears to be to prevent an improper payment after the debt has been transferred, and to protect the rights of the transferee. It matters not in what manner knowledge of the transfer is brought home to the debtor, provided it be clearly shown that he knew his former creditor was divested of all his rights to the debt assigned, and that such knowledge of the fact was derived from the transferee, or from his agent.

In looking to the analogy of notice in the case of promissory notes, we find that the doctrine rests on a practical and common-sense view of the rights of the parties. As the object of the notice is to put the party in possession of the material facts on which his liability is founded, so as to secure the liability of others over to him, the law requires a sufficiently definite description of the note to enable him to know to what one in particular the notice applies; for an endorser may have endorsed many notes, of very different dates, sums, and times of payment, and payable to different persons, so that he may be ignorant, unless the description in the notice is special, to which it properly applies. But a misdescription of the note in the notice will not vitiate, if it does not mislead the party to whom it is addressed, and is not calculated to mislead him, whether the misdescription be in the date, or the form, or the names of the parties, or otherwise. Story on Notes, § 349. And so in *Mills* v. *The Bank of the United States*, 11 Wheaton, 431, a notice which was full and accurate in other respects, but omitted the name of the holder, and stated a wrong date, was held good, there being no other note of like drawer, endorsed by the party. The variance, it was said, could not mislead him, and was not material to guard his rights.

Applying this reasonable standard to the present case, it is impossible to say

that the defendant was misled, or could have had any doubt, as to the party to whom he was to hold himself liable. A demand of payment by *Boyd*, after the notice, would undoubtedly have been met by a refusal.

As the attachments and sequestrations were all posterior to this notice, they could not in themselves retroact so as to defeat the rights of a *bonâ fide* purchaser. So that we are thus brought to the main question in the cause; and that is, whether the institution of the suit, prior to the transfer, for the purpose of compelling *Boyd* to make a new surrender, created a legal incapacity on his part, from that date, to alienate his property in favor of a *bonâ fide* purchaser.

In the argument of this question it has been strenuously urged by the plaintiff that, *G. W. Boyd* was not a party to the insolvent proceedings which, in the year 1820, were instituted in the district court of New Orleans, under the title of *Wm. Boyd & Son* v. *Their Creditors*. It is in evidence, that *G. W. Boyd* was the son of *Wm. Boyd*, and a partner of the house of *Wm. Boyd & Son*. The petition in that case describes *William* and *G. W. Boyd* as the petitioners, and is signed by a member of the bar, who describes himself as attorney of the petitioners. The oath, however, was taken by *Wm. Boyd* alone ; there is no schedule of the individual assets of *G. W. Boyd* ; nor did he appear at the meeting of the creditors. We will concede, however, for the purpose of the present enquiry, and in the absence of proof that the attorney at law was not authorized to appear, that *G. W. Boyd* was a party to the insolvent proceedings, and by reason thereof became discharged from his partnership liabilities, subject to the legal condition of a future liability in the event of his coming to better fortune. This contingent liability is defined by the act of 1817, which was the law in force when the alleged discharge was granted.

" The surrender of property shall only exonerate the debtor to the amount of the property surrendered ; and in case the said property should have been insufficient, if he acquires some other in future, he shall be bound to abandon it until final payment ; provided, however, that the creditors to whom the debtor might have became indebted since his failure shall be preferred to the former creditors for their payment on the new property acquired by the debtor, and that means of subsistence shall be left to the debtor and his family."

Waiving the consideration of the question, whether *Florance*, who disclaimed, on record, the right to represent *Boyd*, was competent, under his power of attorney, to be the medium of the citation of his absent principal in a suit of this extraordinary character, we will proceed to consider the effect of the suit as though *Boyd* himself had been personally cited, in March, 1847.

The law of 1817 was certainly conceived as much in a spirit of mercy to the debtor, as of justice towards his creditors. The policy of the law must undoubtedly be respected in the one case as well as the other ; and it seems to us that the doctrine contended for by the defendants that, on the mere filing of the petition, an incapacity to alienate at once attaches, and that the newly acquired property of the insolvent is deemed to be thenceforth *in custodia legis*, is repugnant to the spirit of the act and to general principles.

Until a judicial investigation is had, and a decree pronounced, the new liability of the discharged insolvent is a matter *en pais*. Has he acquired means more than sufficient for the subsistence of himself and his family ? If he has, the court will order him to surrender the excess when judicially ascertained, and will compel obedience by distringas or other proper process. If he has not, the man is still free. To say that a creditor, by taking this fact for

granted and filing a petition, may at once tie the debtor's hands, is to defeat the policy of the law, which intended, by discharging the unfortunate debtor, to leave him at liberty to apply his industry to the support of himself and his family, and to open the door to the bettering of his condition. But no man would dare to have dealings with a discharged insolvent, his industry would be paralyzed, and his hopes of better fortune be cut off, if the *ex parte* declaration of a creditor could, *per se*, operate a legal sequestration of the insolvent's earnings.

The legislature might, undoubtedly, enact a law which would accomplish such a result; but a court cannot recognize such a rule, unless it be written down in clear terms in the statute book. The doctrine of relation in bankruptcy, which is found in the english jurisprudence, is the creature of statute. At first, under the of statute Elizabeth, it was very severe, and from the moment of committing an act of bankruptcy, without judicial process, the trader was deprived of all power of charging, or disposing of his property, to the prejudice of his creditors. But this severity was found to be disadvantageous to commerce, and pregnant with injustice to innocent third persons; and was, therefore, much relaxed by subsequent enactments. No one can doubt that the existence of this doctrine of relation at all is solely owing to legislation, without which it would have had no place in the english jurisprudence.

These views are strongly corroborated by a consideration of the second section of the statute of 1826, p. 136.

The point in question was not before the court in the case of *Quemper* v. *Bierra*, 8 Rob. 204: nor do we find any thing in that opinion which conflicts with the views which we now express. The language of the court seems to us, on the contrary, unfavorable to the defendants: "Whenever the debtor is required to make a new *cession* thereof, this must take place *after* having ascertained the amount of his new debts to be first satisfied, and the extent of his means of subsistence."

We do not concur with the district judge in the applicability to this case, by analogy, of that rule of universal jurisprudence, which is consecrated by article 2428 of the Code. This was not the case of the revendication of a specific thing. See Civil Code, arts. 2420, 2423. Tous ceux auxquels la loi ne l'interdit pas, peuvent âcheter ou vendre.